The next case called is 122-905 Piccioli v. Board of Trustees of the Teachers Retirement System Ms. Seitz, are you ready? Yes, sir You may proceed May it please the Court, my name is Esther Seitz and I'm here to represent the Plaintiff-Appellate David Piccioli. This Court's pension cases, known as Kenerva, Heaton, and Jones, establish that once an employee commences work and becomes a member of the public retirement system, any subsequent changes that decrease the benefits of membership in the pension system are unconstitutional. But that's exactly what the State did here. It promised David a right, via the 2007 Act, to become a TRS member and to earn retroactive service credit for his public sector union work that was dedicated to serving public school teachers. Despite that promise and David's acceptance of it, in 2012, the State unilaterally eviscerated the rights David had been granted in TRS. This appeal offers this Court an opportunity to rectify this constitutional violation and ensure that laws like the 2012 Act that violate the Pension Protection Clause in this Court's recent pension jurisprudence will not be enforced. It was only in this case, and almost a decade after David joined TRS, that the State argued, for the very first time, that the 2007 Act is actually special legislation. But qualifying for benefits under the 2007 Act was no cakewalk. It required several things of my kind. It required a teaching certificate. It required teaching service. But more than that, it required decades of service in a union that was dedicated to serving public school teachers. It also required filing an irrevocable, irrevocable is ironic, election to join TRS. And that had to happen within six months of the effective date. And for David, it involved paying around $193,000 of his own money into TRS. That included the employee and the employer's side of the contribution. And that's unusual. Because public school teachers that are in TRS, they only pay the employee side of the contribution. And the local school district pays the employer side. For union employee members like my client, he had to pay both. In addition, he had to pay interest compounded annually at a rate of 8.5%. And because my client is not a wealthy man, he had to sell assets and to live frugally to make those payments over the course of four years. We admit that the optics aren't great. But that's because they're viewed in hindsight. Looking back now, what happened, David turned out to be the only one to take advantage of the 2007 Act. However, there's nothing in the law, in the text of the 2007 Act, that is geared at him. Its benefits are open to anyone working for a teacher's union who took the necessary steps to qualify under the law's terms. Also, in hindsight, David happened to work for the union that was involved in lobbying the 2007 Act. But critically, he had nothing to do with the bill's passage. He was not in IFT's management. He was not in charge of lobbying pension issues. Never lobbied pension issues. In fact, the record is clear that he did not know that the union was involved in lobbying this bill until many years after it was enacted. But optics, especially when viewed through the rearview mirror, should not drive legal outcomes. What is unique about the teachers certified prior to 2007 that would require the legislature to differentiate against those that were certified afterwards? So the teachers that were pre-2007, like my client, the ones that worked for the union, there were people that worked for the union that were teachers that were already earning credit working for the union because they were teachers before they joined the union. My client was somebody who wasn't previously a teacher. So this law put him on par with his colleagues who were already TRS members and earning TRS credit for their union service. This law allowed people who, like my client, were previously not teachers but serving teachers indirectly through the union to become TRS members. And to kind of put them in the same position as their colleagues at the union who were members of TRS and earning TRS credit for their union service. Can I ask you a question, speaking of hindsight, which you mentioned a minute ago, about the motion to request the court to take judicial notice of certain documents? I have really two questions to ask you about that. This issue of special legislation and whether anyone at the different union, the IEA, knew anything about this existence of this legislation before it became law, all that was raised in the trial court, from what I understand. These supplemental documents were not presented to the trial court, nor were they referenced in the original brief. In the response to your motion, the state argues, TRS argues, that there was an interrogatory that explored this issue, in which the answer was that no one other than this union had anything to do with the drafting of the legislation. And now, you're asking us to take, just right before oral argument in this case, a motion is filed that we take judicial notice of certain facts. And my question is, the documents that you ask us to look at, do they create a question of fact? And this, of course, comes with some summary judgment. How does this court resolve questions of fact at this point? It's not a question of fact. They are simply facts that exist and that are on the public record. And we would ask the court to exercise its inherent authority to take notice of these facts that are really generally known, at least as far as they exist in the public record. Although, everyone agrees that no one really knew about this. But there was an interrogatory that specifically asked the question, and it was not revealed then. I think my client was personally not aware of the fact that there had been a witness slip filed. But again, that's evidence of the fact that my client wasn't involved in lobbying this bill. He wasn't involved in lobbying pension issues. It did come to our attention later on, in connection with arguing this appeal, that these witness slips had been filed. And we thought it was important for this court to know that IEA did go on record taking a position, or actually declining to take a position on the bill, but clearly going on record being aware of it. My second question is, why is that relevant? Wouldn't you agree that this court has stated that the analysis for special legislation argument is a law the legislature considers appropriately applied to a generic class presently existing, with the attributes that are in no sense unique or unlikely of reputation in the future, cannot rationally, and hence constitutionally, be limited of application by a date restriction that closes the class as of the statute's effective date? If that's the standard we're looking at, what do these pieces of paper have anything to do with that? They probably don't. I understand that's a quote from the Peoria School District case. I think the reason that we wanted this court to be aware of the fact that IEA filed witness slips is simply because the state's argument became essentially that IFT was the mastermind of this bill, and my client got this bill passed just for himself so he could take footfall, and that it all happened in a secret process. And that clearly isn't the case, because IEA knew about this bill. We don't think that the IEA witness slips are actually necessary for us to prevail in this case, because the issue really is, did the state prevail in meeting the true prompt test, the special legislation test that your honors have articulated? But since the state was focused so much on whether or not the other union knew about it, and if they were in the know or if they were kept out of the loop, we thought that the witness slips would be important and would be an honest thing, would be something that this court should be aware of. We would ask you to take judicial notice of that. Counsel, it seems that persons employed by the union after the effective date of the 2007 Act were a class that was basically similarly situated, right? Can you say that? Well, the 2007 Act, as I understand the facts, conferred a special benefit on plaintiff alone, although there may have been a few others in the class of union workers that could have taken advantage of it but did not. You're right that that pension benefit lapsed. It had a deadline. And after it expired, those people were not allowed to purchase retroactive service credit. To the extent that your honors consider them similarly situated, and we don't believe they are, because they joined later, right? These are people that came on board with the union later, and I think the mere fact that they joined later makes them differently situated. But if you assume that they are similarly situated, that distinction of permitting them to be in TRS or not isn't arbitrary because in the pension context, it is necessary to set deadlines. In laws that have expiration dates or deadlines in the pension context, they're commonplace. The whole idea of the Tier 1 and Tier 2 retirees hinges on that. This Court's own opinions have said that pension benefits really depend on when, the timing of a person joining the system. In here, those people, those latecomers, the people that joined in 2008, for example, they came later and they don't have the retroactive buyback option. That's absolutely correct. But what they do have is they have the option of earning TRS credit forward. You mentioned earlier the optics of the situation. Probably admittedly, they're not good, right? Someone substitutes teachers for one day and then receives a public pension. In response to your own premise that we should not consider the optics, you said that this individual didn't know what was going on, wasn't aware of it, wasn't aware there was legislation. Is that what's important? If he was aware, if he knew what was going on, is that a different situation? No, it's not. It was just a response to the optics argument because the state is focusing so much on optics. We don't think optics matters. We don't think optics should trump. We think the special legislation test that this court articulated in Schiller because Schiller is most akin to our circumstances, that should prevail. So if he had a friend in the legislature, you weren't saying that to differentiate between him saying, hey, he was promoting this particular piece of legislation? No. No. It frankly wouldn't matter under a legal analysis, but for optics purposes, even if we look at optics, and I understand they to some degree matter. Was that all part of the record too, what he knew or didn't know? Yes, there was evidence, depositions on that. Counsel, I understand that the General Assembly in 2012 stated that they believe the 2007 Act was unconstitutional. Should that affect our deliberations? No, it shouldn't because it's not the General Assembly's job to decide the constitutionality of laws. If they want to abrogate a law, if they want to decide that law is no longer good public policy, if they want to decide that, you know, we really don't want to give public pension benefits to people who only indirectly serve government employees, that's okay, and they can change the law going forward, but not retroactively, and especially in the context of pension rights where this court has made clear that once the right vests and once the person starts working in a covered position, that right cannot be taken away. And that's what happened here. Under the first test of special legislation analysis, the state can't meet its burden of proof because it hasn't identified somebody who is similarly situated but who was excluded. In other words, to be denied a benefit under the first prompt, a person must have actually applied. And here there's no evidence that anybody other than my client actually wanted to jump through the hoops of seeking the benefits under the 2007 Act. And the reason for that is because the financial contributions were really significant. Under the second prompt of the special legislation analysis, the state must show that the 2007 Act's deadlines are arbitrary, but it can't do that either. Again, deadlines or sunset provisions are commonplace in the pension arena, and they're constitutional. The legislature's promise here was that the 2007 Act presents no cost to the system. But that promise hinges on the fact that they had an idea, at least in general terms, of the number of employees that could take advantage of the Act. Without a cap or a benefit cutoff, as the state calls it, budgeting would be difficult or impossible, and that would be repugnant to the goal of PRS's, of protecting TRS's funds and government finances generally. Recent amendments to the pension codes have expressly identified that protecting the funds' solvency is an important legislative objective. In Crucius, this case also held that a cutoff, which was much more aggressive than a cutoff here, because in Crucius, the cutoff happened a year and a half before the effective date of the law, and it excluded all riverboats, except for one from benefiting the law, was not special legislation. And that's because the court said that the rule was, or the law was economically defensible. So in light of TRS's predicament, it's also perfectly reasonable to sunset pension benefits as opposed to letting them endure in perpetuity and promising annuities for which there is no funding. Because the state cannot meet its burden of proving that the 2007 Act is special legislation, and because David legitimately relied on the rights granted to him under that statute, the Pension Protection Clause protects those rights from being diminished or impaired. The state's decision to eviscerate the rights that David had earned for his pre-2007 pension service did exactly that, and that's why it's unconstitutional. I leave this court and opposing counsel with one question. If the 2007 Act is special legislation, as the state now claims, then why isn't that true for the 2012 Act, which was clearly designed to and did only target my client? Thank you. Thank you. Counsel? Thank you. May it please the court, Chief Justice, counsel. I'm Assistant Attorney General Richard Huzzack, counsel for the defendant, appellee of the Teachers Retirement System in this case, and I urge the court to affirm the circuit court's holding that the 2007 Act's relevant provisions, which permitted employees of a statewide teacher's union to perform one day of substitute teaching service, and if they did so before the Act was signed into law, obtain service credits for all of their prior union employment, that that violated the special legislation clause of the Illinois Constitution. Mr. Huzzack, would you, sorry to interrupt at the beginning of your argument, but why don't you start with the question that counsel cites left with us. If the 2007 legislation was special legislation, how is the 2012 targeting the 2007 legislation, not special legislation? The special legislation jurisprudence by this court recognizes that there are situations in which the legislature legitimately addresses unique circumstances, and the Peoria School Board case specifically identifies that principle and describes the Schiller case and the Crucious case as examples of exactly that type of situation. That same notion applies specifically to the 2012 Act. There was a unique situation of people that had availed themselves of benefits under a law that was unconstitutional, and to deal with that unique situation, the legislature repealed it. And it's not uncommon for a law to repeal an earlier law. What is unusual about this situation is that when the later law requires a state agency to take specific actions to undo things that were done under the earlier law, and where if the earlier law was valid, it couldn't constitutionally require those to be undone because those were a vested constitutional right. If it requires that those things be undone, and it can do so only if the earlier law is unconstitutional, it has a unique situation that it can address under the special legislation clause. I would add that no argument has ever been made that the 2012 Act violates the special legislation clause. It wasn't argued in the circuit court. It wasn't argued in the briefs before this court. It was a rhetorical flourish at the end of the appellant's opening argument. If the court would like further briefing on it, I'd be glad to provide it, but I think at this late date, under the court's rules of forfeiture, the argument has been forfeited, and it has no substance in light of the unique nature of the circumstances that the 2012 Act was addressing. So the controlling issue is whether the effective date eligibility cutoff in the 2007 Act, which excluded anybody who satisfied that Act's other eligibility criteria, but did so only after that law took effect, that renders it unconstitutional under the special legislation clause. And I think the circuit court got it absolutely right that under this court's teaching in the Peoria School Board case, which follows the Eastside Levy case, which has subsequently been followed in the Moline School District case, that I would quote again the language that Justice Heist quoted, when there is a generic class with attributes that are in no sense unique or unlikely of repetition in the future, to then create a discrimination between those who benefit from a law and those that don't through the device of a temporal cutoff is an inherently arbitrary discrimination that violates the special legislation clause. And this case is a perfect example of exactly that type of problem. I think it's relevant that the Peoria School Board pointed out that the legislature has used these types of temporal cutoffs repeatedly in the past in a way to grant special favors, and the court has been vigilant, especially after the 1970 Constitution made clear that although there is deference to legislative determinations about classifications, the Constitution, unlike its predecessor, says that whether a general law could have been passed is a matter for judicial determination. So the court can't simply just ignore whether there is, in fact, a rational basis for treating similarly situated persons differently. The factual background, I think, is adequately addressed in the briefs, but I don't want to suggest that the nature of the genesis of the act is simply here for optics. It tends to inform the understanding of why this law was drafted the way it was drafted. It was drafted by the IFT for the IFT, and it was put into the legislative hopper at the close of the veto session. Before it was passed, their memos were circulated among the IFT telling everybody, here's your chance to get retroactive service credits. Now, opposing counsel says that this law merely put IFT employees, theoretically IEA employees, too, on a par with their colleagues who had prior teaching services and could approve service credits after they performed such teaching service. That's not correct. Prior law did not allow anybody to get retroactive service credit for prior employment. Historically, the statewide teachers' unions hired many of their people from teaching service. You work as a teacher or a certified school administrator for a number of years. Maybe you're not quite vested, and then there's an election and somebody asks you to work for the statewide teachers' union, and you either have to give up the ability to vest in the TRS if you work for the union, or you give up the opportunity to work for the union. And so it seems like that is why there's a legislative justification for allowing people to continue to approve service credits as teachers if they then go to work for a statewide teachers' union after having been teachers. Historically, it appears that nobody had ever figured out that you could do that if you worked for a union without having previously served as a teacher just by doing one day of substitute teaching service. I think that's what surprises people and shocks them so much about this law. There was sort of a latent attribute of the law that nobody had ever figured out, and it wasn't enough just for people in the IFT to take advantage of that and get prospective service credits after one day of substitute teaching for later union employment. They also wanted to get retroactive service credits. It went through the legislative process. It got passed. The IFT lobbied for it. If the court has any questions about the IEA's involvement in this, it's clear there was no involvement in drafting or promoting this bill like there was for the IFT. In fact, there was one lobbyist on the last, essentially, day, on the last step of the process for the bill who didn't even take no position on the underlying bill. He took no position on an amendment that had nothing to do with his provisions that benefited the IFT and the IEA. So this did not put IFT employees on a par with their colleagues. And I call it the latent aspect of this bill is that nobody had ever used this opportunity to be a substitute teacher before to get service credits for union employment. The notion that, especially in the lack of any evidence that this was circulated among IAEA employees, the fact that nobody had ever used substitute teaching as the predicate for getting later union service credits belies the speculative conjecture by opposing counsel that necessarily all the IAEA employees knew about it and they just decided not to take advantage of it because it would have cost them too much. Even if that were true, the law affects a discrimination between people who could satisfy this certification as a teacher before the law took effect and those who could not. So on the substantive questions of the special legislation clause, there is a two-prong analysis. And the two prongs are interrelated. The first prong is whether the parties or the groups or objects are similarly situated. And if they are, then that's a necessary element of the special legislation analysis. And if they are similarly situated, then the question is, is there a legitimate justification for discriminating between them or treating them differently? Now those two prongs of the analysis are opposite sides of a single point, I would submit. If people are similarly situated, it is quite difficult to say that we can treat them differently in a rational way as opposed to an arbitrary way. And I think although the court has focused on both aspects of the analysis in the past, I can't think of a single case in which the court explicitly held that these groups or persons or objects are similarly situated, but there is nonetheless a rational justification for treating them differently. But let me nonetheless treat both aspects of the analysis separately. Are the people who benefit from the statute because they met the effect that they cut off similarly situated to people who did not and could not meet that cutoff? The answer is that they're similar in all relevant material respects in light of the purpose of the law. If the purpose of the law is to reward people for union employment by giving them service credits in a public pension system, then there's nothing about the eligibility cutoff that promotes that purpose. It doesn't focus on some aspect of meaningful differences between those groups that's related to the purpose of the law of rewarding people for union service. The plaintiff argues that, well, the difference is that some people actually applied for those benefits and other people didn't apply for those benefits. That's circular. It essentially creates a catch-22 and tries to justify the law by virtue of the catch-22. If the law says essentially, if you didn't apply before this law took effect or meet the certification criteria before it took effect, don't bother applying because you're ineligible. And now the plaintiff is saying, because they didn't apply, they're not similarly situated. That gets the analysis exactly backwards. It turns the vice of the law into a supposed virtue that justifies it with no relationship to the underlying purpose of the law itself, which is rewarding union service in a statewide teacher's union. So I do want to address, with respect to the second prong of the analysis, whether the discrimination is arbitrary, the cases that legitimately use criteria, like a temporal cutoff, and those that don't. And the Peoria School Board case and the Moline School Board case, I think, go a long way to articulating this sort of framework of analysis. And I would submit that the legislature can use these types of criteria, geography, population, time, temporal criteria, in legitimate ways and illegitimate ways. There are two primarily legitimate ways in which those criteria can be used and have been used. One is when the purpose of the law directly relates to the criteria in itself. So if you have a population criteria that relates to cities over a million people, it's because there are differences in the actual circumstances between cities that have more than a million people and other cities. That's a real-world difference that the legislative criterion is focusing on. Sometimes population criteria, let me just also say, sometimes population criteria and geographic criteria can be used in an impermissible way, too, and there are plenty of cases to that effect, Belmont Fire Protection District, et cetera. Sometimes, though, those criteria are used not because they directly relate to the purposes of the law itself and the means to implement those purposes, but simply because they're a means to identify a person or situation that is unique. And if that situation is unique, it's not impermissible to use definitional criteria that depend on geography, population, or time. And that is essentially what the Peoria School Board case says about the Crucious situation, which involved the Emerald Casino. It was the only one that was shut down. It was on the Mississippi River. The court said, this is unique. It was permissible for the legislature to take a unique situation, use definitional criteria that relate to it, and deal with it separately from everything else. The Schiller case is exactly the same. It was a unique situation that the legislature used these types of criteria to identify and then address. But the third category of situations in which the legislature uses these types of criteria is when they are an arbitrary device to create an impermissible discrimination between similar situated persons or things. And that is the Belmont Fire Protection case. That is the Peoria School Board case. That is the Moline School District case, where those criteria aren't used to define a unique situation or to implement a policy based upon those criteria themselves, but is simply a time-honored but unconstitutional means to try and grant special favors. And that's what the special legislation clause was intended to prevent. So the plaintiff argues that there is, in fact, a valid reason for this discrimination in this case. And that is that the people who got in before the cutoff, who got their substitute teaching certification before the law was even signed, that the legislature legitimately wanted to treat them differently because it had fiscal concerns. It didn't want to spend a lot of the state's money for promoting this purpose. That surprises me because there's not a shred of evidence to support it in the record, and it's not even supported by rational speculation. In fact, the terms of the 2007 Act themselves create a neutral fiscal position for the benefits that this created. As the plaintiff's counsel pointed out, the law required contributions for these retroactive service credits for prior union employment based upon the normal cost of those benefits plus accrued interest at 8.5 percent, which happened to be the historic earnings rate of the TRS for the years preceding this law. So when on the floor of the legislature the sponsor of the bill said, this will cost the state nothing, it's because the bill was designed to cost the state nothing. And to say now that we're going to save the money by limiting the benefits to some small select group of people, you can multiply nothing as many times as you want and it still comes up with nothing. There was no fiscal purpose of this law and there was no fiscal impact of this law. And to say now after the fact, when it creates this arbitrary distinction between people who were certified before and after it was signed into law, to say that that discrimination is justified by financial concerns is I think revisionist fiction to put it mildly. What we have is exposed by later events a clear attempt by one group to get a special set of privileges for its members and to do so in a way that didn't draw a lot of attention to what was going on. There was not discussion on the floor of the House or the Senate about oh, you can do one day of substitute teaching service and now you can buy all these years of prior service credit for working for a union. This came in at the end of the legislative term without much fanfare with a description that said this was a technical correction for a prior cleanup bill for early retirement legislation. That argument was made below that that's in fact what was going on. It's been abandoned because there's no basis for it in the legislative history. So we have a special favor bill. We have a special favor bill that treats similarly situated people differently and it does so based on an arbitrary discrimination that's unrelated to any meaningful differences between the people in reference to the purposes of the law. I think the court's teaching of the Peoria School Board applies directly here and we urge the court to follow it in this case as well to affirm the circuit court's judgment that the effective date eligibility cutoff in the 2000 Act creates an arbitrary discrimination between similarly situated people and therefore renders it unconstitutional under the special legislation clause. And I'm not asking the court to hold that the legislature decided that the 2007 Act was unconstitutional. It simply made that declaration as a roadmap or a guide for the court to ultimately address that issue and that is, I submit, a correct declaration that the court should deem was correct. Thank you so much, Your Honors. Thank you. A reply? Yes, Your Honor. Thank you. The only way that this bill costs nothing to the state is because there was a cap. That's the reason they could promise that. If the pool was left open indefinitely, they couldn't have made that promise. So the lawmakers' statements about this bill being a zero, costing nothing, is simply because of the cap. Once you take that cap away, that promise would no longer be good. Opposing counsel also states that the Schiller holding hinges on the fact that the property or the parcel in that case was somehow in a unique situation geographically or otherwise. But that's not what this court's opinion says. It says that in that case, like here, the person launching the special legislation challenge was not actually the person who was denied the benefit. And the court points exactly that out. And it says, plaintiffs do not claim that they were similarly situated. Instead, they provide conclusory arguments, like the state does here, that this statute prevented any other property owner who meets any of the other boundary change merely because he or she did not have a petition on file by the effective date of legislation. Sound familiar? At best, plaintiffs point to the property owners to the north and south of Olhausen. Olhausen is the person who got the benefit, who had similar situated vacant farmland. However, the mere fact that this property exists is not enough to satisfy the plaintiff's burden without any additional evidence that those unnamed property owners could have benefited from the amendment but for the effective date limitation. No evidence is in this record that these owners sought to convert their farmland into residential areas, desired the village of Frankfort to annex their property, or additionally sought a school district boundary change. There's no evidence in this record of anyone similar situated to Olhausen or any other property owner who sought a boundary change, and therefore there's nobody similarly situated. So it does matter if somebody applied. It does matter if somebody tried to seek the change and applied for the benefit. Schiller does not hinge on this case, the parcel or the property in this case being somehow unique because of its geography. It decides the first prong on the special legislation analysis based on the fact that the plaintiff in that, the special legislation challenger in that case, like this state here, did not identify somebody who was applied, who jockeyed, who pursued an interest, but who was excluded from that interest. And that's the case here, and that's why the state can't meet its burden of the first prong. David's contribution to TRS does not serve us as a public school teacher in the traditional sense. Instead, his contribution to the state consists of decades of advocacy for public school teachers while working for a public sector union that has a mission of ensuring teachers' interests are represented before the Illinois General Assembly. David's contribution was also, in large part, financial in nature. And like traditional teachers working for public school districts, like I said, he paid both sides of the contribution, the employer and employee side. So as TRS's corporate representative testified in this case, and that's in the record, union members' contributions tend to be higher and therefore better for TRS's solvency than those of traditional teachers because the local school districts don't always pay their share. David's monetary contributions here were significant. He didn't get a free ride. He didn't get a cheap ride. He paid $193,000 of his own money for securing rights under the 2007 Act. That law was validly on the books while he complied with its terms. He didn't lobby the law, and the law was by no means limited to him. David followed the 2007 Act in taking advantage of a pension benefit the state properly offered him. The state may now question whether it may be good public policy to extend pension benefits to employees who serve government indirectly, as my client did through public sector unions. But giving union and other non-governmental employees rights in public pension systems was commonplace in Illinois for many years, and it was perfectly within the General Assembly's prerogative to extend those rights. The General Assembly is free to sunset or to abrogate these laws, but it cannot constitutionally void them and act as though they never existed because that is a clear diminishment of the best pension right, and therefore it's unconstitutional. We would ask that this court correct the legislature's and the trial court's error. Let me ask one last question. The first issue in your brief, and taking up almost half of your brief, is your argument that TRS does not have standing. Have you abandoned that argument? No, we have not. You've not argued it at all? I haven't argued it in my reply brief and orally because I don't think it's my strongest argument. I think we can go straight to special legislation and we win there. But I am by no means abandoning the standing argument. I do not believe that TRS is standing. TRS's job under its own statute, their statute creating it, says that it is the job to protect the fund and to act in the best interest of its annuitants, and by TRS challenging a law that gives one of its annuitants a right, it is doing exactly the opposite. So, therefore, it doesn't have the legislative, the legislature has not given TRS the authority to launch the constitutional attack that it has done here. The response, of course, that you do not respond to in your reply brief is that ideas of standing are ideas of bringing a claim, being the plaintiff. Here, this is a defensive action. Does that make a difference in terms of standing? No, it doesn't make a difference because TRS doesn't even have the power, because it's a creation by the General Assembly, and it doesn't have the power to make an argument against its own members. So it's not really a standing issue, but also doesn't have even the inherent authority to advocate against us. Thank you. Thank you. Case number 122-905, Piccioli v. Board of Trustees of the Teachers Retirement System, will be taken under advisement as agenda number 16. Ms. Seitz, Mr. Gusak, we thank you for your arguments. You're excused.